IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA WATSON, | ) | CASE NO. 1:12-cv-02483 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Patricia Watson ("Plaintiff" or "Watson") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 13.   As explained more fully below, the Court

**AFFRIMS** the Commissioner's decision.

## I.  Procedural History

Watson filed applications for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") on April 1, 2009.  Tr. 150-153, 154-159.  She alleged a disability onset

date of March 5, 2009 (Tr. 150, 154, 190) and claimed disability due to hypertension; headaches;

heart problems; neck, back, and joint pain; and emotional problems (Tr. 84, 88, 92, 94, 190).

After initial denial by the state agency (Tr. 84-87, 88-90), and denial upon reconsideration (Tr.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

92-93, 94-96), Watson requested a hearing (Tr. 99).  On May 19, 2011, Administrative Law

Judge Patrick J. Rhoa ("ALJ") conducted an administrative hearing.  Tr. 29-79.

In his July 8, 2011, decision (Tr. 9-27), the ALJ determined that Watson had not been

under a disability from March 5, 2009, though the date of the decision.  Tr. 12, 22.  Watson

requested review of the ALJ's decision by the Appeals Council.  Tr. 8.  On August 10, 2012, the

Appeals Council denied Watson's request for review, making the ALJ's decision the final

decision of the Commissioner.[2]  Tr. 1-5.

## II. Evidence

### A.    Personal, educational and vocational evidence

Watson was born in 1964.  Tr. 34, 150, 154, 221.   She was 46 years old at the time of the

hearing.  Tr. 34.  Watson has a high school education and attended classes at a community

college and through two online colleges.[3]  Tr. 36-37, 195.   Watson lives with her aunt in her

aunt's house.  Tr. 34-35.  Watson has two adult children who do not reside with her.  Tr. 35.

She has worked in the past as an accounts receivable clerk, a customer service

representative for a telephone company, and as an insurance/medical billing clerk.  Tr. 38-42,

191.  She last worked at a company called Receivables Outsourcing, a medical billing and

insurance follow up company.  Tr. 38.  She was employed at Receivables Outsourcing from the

end of 2004 through March 16, 2009.  Tr. 38.  She stated she was in and out of the hospital a lot

and ended up losing her job.  Tr. 38-39.  She indicated that she had been told she had used up too

much of her FMLA leave time.  Tr. 38-39.

### B.    Medical evidence

---

[2] As indicated in the Notice of Appeals Council Action, the Appeals Council considered additional evidence
submitted by Watson but found that the information did "not provide a basis for changing the Administrative Law
Judge's decision."  Tr. 1-2.

[3] She took some nursing classes and also sought a medical billing and coding certification.  Tr. 36-37.

## 1.  Treatment history

Prior to her alleged onset date of March 5, 2009, and, dating back to 2005 and 2006, Watson  received treatment for chest pain, hypertension, and headaches.  Tr. 55, 250-251, 292, 310-328, 329-331, 346-379, 679-686, 687, 1053-1079, 1195.  She also received treatment for her right hip problems.  Tr. 43-44, 395-396.  Watson was also treated by Dr. Gary M. Wilkes, M.D., for a brief period of time in 2008 for major depression and panic attacks.  Tr. 1122-1124, 1160.  Dr. Wilkes noted that Watson responded poorly to treatment because she did not continue with treatment. Tr. 1124, 1160.

On or about December 30, 2008, Dr. Rajesh Agarwal, M.D., admitted Watson directly to the hospital after she presented with complaints of nausea, vomiting, diarrhea, and clinical dehydration.  Tr. 295, 299.  She was discharged on January 2, 2009, in stable condition with instructions to resume activity as tolerated and to follow up with Dr. Agarwal.  Tr. 295-296, 303.

Thereafter, on March 3, 2009, two days prior to her alleged onset date, Dr. Agarwal admitted Watson into the hospital directly from his office because of a hypertensive emergency. Tr. 263-265.  She complained of having a headache for three days; she had high blood pressure; she had vomited once the day before; and she complained of photophobia.  Tr. 264, 266.  Dr. Agarwal noted that he was not certain whether her condition was the result of "a blood pressure compliance issue or . . . just a stress issue."  Tr. 264.   Watson was discharged on March 5, 2009, her alleged onset date.  Tr. 269.  On discharge, she was provided with information on smoking cessation and advised to follow up with Dr. Agarwal.  Tr. 269.

Four days later, on or about March 9, 2009, Watson was again admitted to the hospital with complaints of shortness of breath for a 2-day period.  Tr. 275, 276, 278.  Watson indicated that her shortness of breath became worse while at work.  Tr. 288.  Watson's "[s]hortness of

breath was moderate, exacerbated by lying flat and exertion and [she was] admitted with diagnoses of dyspnea, elevated troponin, peripheral edema."  Tr. 276.  Watson was not entirely sure of the medications that she was taking.  Tr. 288.  Dr. Agarwal noted that he questioned Watson's compliance with her medications.  Tr. 288.

While admitted, Watson underwent various tests.  For example, a March 10, 2009, chest x-ray showed "Right lower lobe infiltrate.  Suspect pneumonia."  Tr. 1239.  On March 11, 2009, a CT chest scan was performed which showed "Signs suggestive of heart failure with pulmonary edema . . . [and inability to] identify an infiltrate at the right base, as suggested on the most recent chest x-ray."  Tr. 1238.  A later March 12, 2009, chest x-ray showed "Cardiomegaly.  No acute pulmonary findings."[4]  Tr. 1237.

Cardiologist Dr. Michael Kalus, M.D., conducted a cardiology consult during Watson's admission.  Tr. 276, 291-292.  He found no evidence of acute coronary syndrome.  Tr. 292.  He indicated that troponin was elevated in one reading but repeat troponins were negative.  Tr. 292.  He also noted that Watson had undergone a cardiac catheterization the prior year which was negative for any significant coronary artery disease.  Tr. 292.  He concluded that no further cardiac evaluation was needed.  Tr. 292.  Watson's final diagnoses were pneumonia, hypertension, dysthymic disorder, tobacco use disorder, migraine, obesity, and osteoarthrosis.  Tr. 276.  She was discharged on March 14, 2009, in stable condition with instructions to follow up with Dr. Agarwal.  Tr. 276-277.

On April 27, 2009, Watson was taken to the hospital by ambulance for complaints of chest pain, shortness of breath, hot flashes, and nausea that she experienced while at church.  Tr. 720, 721, 733.  Watson reported that she "smoke[s] cigarettes, marijuana and drinks alcohol

---

[4] Cardiomegaly is an "abnormal enlargement of the heart from either hypertrophy or dilatation."  *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 299.

socially, approximately 2 to 3 times a week." Tr. 733.  Dr. Agarwal admitted Watson for

medication management, monitoring her labs, and for cardiology and GYN consults.  Tr. 734-

735.  Smoking cessation was discussed with Watson and she was encouraged to quit.  Tr. 734-

735.

On September 16, 2009, Watson was admitted to the hospital again with complaints of

chest pain.  Tr. 1175-1192.  An EKG was performed which showed, in part, "Possible left atrial

enlargement.  Left ventricular hypertrophy with repolarization abnormality."  Tr. 1192.  A chest

x-ray was also performed which was normal and showed, "The cardiopulmonary silhouette and

mediastinum are satisfactory.  Both lungs are clear.  There are no acute findings or significant

interval changes."  Tr. 1186.  On September 29, 2009, Watson saw Dr. Agarwal for follow up

and related her chest pain from the prior week to a panic attack.  Tr. 1210.  Watson was willing

to try a medication that could help her blood pressure.  Tr. 1211. Dr. Agarwal planned to

continue Watson on medication and noted that Watson should stop smoking and lose weight.  Tr.

1211.

On January 23, 2010, Watson was taken to the hospital by ambulance with complaints of

chest pain that had lasted for about 1 day and through the night.  Tr. 1201.  She also complained

of weakness, shortness of breath, and nausea.  Tr. 1201.  She was continuing to smoke and

reported that she drank socially.  Tr. 1201.  She reported being compliant with her medication.

Tr. 1201.  Dr. Agarwal admitted Watson for medication management, monitoring labs, and a

cardiology consult.  Tr. 1203.  Smoking cessation was discussed with Watson and she was

encouraged to quit.  Tr. 1203.  A chest x-ray indicated no acute pulmonary process.  Tr. 1202.

Watson's diagnoses included congestive heart failure, anxiety, hypertension, severe pneumonia,

depression, tobacco use, and renal insufficiency.  Tr. 1202.

In October 2010, Watson was seen at the Fleet Medical Center.[5]  Tr. 1336-1341.  Her blood pressure was elevated and she reported headaches.  Tr. 1340, 1339.  A CT brain scan was performed which showed that, when compared to a July 5, 2009, scan, there were no significant interval changes and no acute intracranial process was identified.  Tr. 1310.  On November 6, 2010, medical personnel at the Fleet Medical Center informed Watson that her CT scan showed no abnormalities.  Tr. 1335.  Watson's headaches continued but were better.  Tr. 1335.

In November 2010, Watson continued seeing providers at the Fleet Medical Center.  Tr. 1333-1334.  She reported not being able to sleep well.  Tr. 1334.  Her headaches were continuing daily but they were not as severe.  Tr. 1333, 1334.  Her blood pressure was elevated; her stress level was increased; and she reported that she was unable to control her temper.  Tr. 1333, 1334.  Watson indicated that her problems may all be related to her increased blood pressure.  Tr. 1333.

On December 17, 2010, Watson was admitted to the hospital for complaints of left sided numbness and facial numbness and weakness.  Tr. 1277, 1278, 1295.  On admission, Watson's diagnoses included acute renal insufficiency; left sided weakness/numbness rule out TIA; and dehydration.  Tr. 1281, 1295.  Neurology was consulted (Tr. 1295) and, on December 19, 2010, Dr. James W. Jordan of the neurology department performed a consultation with respect to Watson's complaints of left upper extremity weakness (Tr. 1304-1307).  On examination, Watson's strength was 5/5 in her upper and lower extremities.  Tr. 1306.  Dr. Jordon opined that Watson was suffering from acute to subacute onset of left sensory disturbance.  Tr. 1306.  Watson reported some subjective weakness that was not evident during the exam but she was "developing mild expressive aphasia in the setting of titrating blood pressure medication."  Tr.

---

[5] It is not entirely clear from treatment notes which medical providers from Fleet Medical Center treated Watson but records suggest that she may have been treated by Dr. Giatis.  Tr. 1322, 1329.  Also, during her testimony, Watson indicated that she was seen by Dr. Jordon Scott, Dr. Lustig, and one other medical provider at Fleet.  Tr. 45.  In her brief, Watson states that she was seen by her primary care physician at Fleet Medical Center but she does not identify the provider.  Doc. 15, p. 9.

1307.  Dr. Jordan indicated that there were stroke risk factors present, including family history of stroke, personal history of hypertension, heart failure, nicotine abuse and remote history of cocaine abuse.[6]  Tr. 1307.  Dr. Jordan recommended an MRI and basic stroke labs along with patient monitoring.  Tr. 1307.

Dr. Kalus was also consulted for uncontrolled hypertension (Tr. 1295) and generalized weakness/abnormal electrocardiogram (Tr. 1257).  On December 19, 2010, Dr. Kalus saw Watson.  Tr. 1257-1258.  He indicated that Watson's cardiac examination was "entirely unremarkable" and there was "no evidence of any cardiac event."  Tr. 1258.  On December 20, 2010, an echocardiogram was performed and reviewed by Dr. Kalus.  Tr. 1297.  The echocardiogram showed a moderate to severe left ventricular hypertrophy with diastolic dysfunction and good overall systolic function.  Tr. 1297.

Watson was given antihypertensives.  Tr. 1296.  Her condition gradually improved and, on December 21, 2010, Watson's blood pressure was 167/107, her left sided weakness had improved, her MRI showed no evidence of infarct, and she was discharged home.  Tr. 1296, 1298-1303.  Watson's final diagnoses included transient cerebral ischemia, acute kidney failure, congestive heart failure, dehydration, hypertension, tobacco use disorder, cannabis abuse and cocaine abuse.[7]  Tr.  1296.  She was advised that she should follow a low salt, cardiac diet; she could resume her prehospital activity; and she should stop smoking.  Tr. 1296.  She was also advised to reschedule her renal ultrasound, follow up after her ultrasound, and to follow up with neurology.  Tr. 1296.

In January 2011, Watson continued to complain of intermittent numbness on the left side.  Tr. 1324, 1327.  She was continuing to have insomnia.  Tr. 1327.  A sleep study revealed mild

---

[6] Watson reported to Dr. Jordan that she had used cocaine in her early 20's.  Tr. 1305.

[7] Watson's  urine screen was positive for cannabinoids  but negative for cocaine and other drugs.  Tr. 1269-1270.

sleep apnea.  Tr. 1323.  On January 25, 2011, Watson called her doctor and reported that she was experiencing tingling in lips and hands and having left sided chest pain with shortness of breath. Tr. 1324.  She reported that her pain had been intermittent for 25 minutes.  Tr. 1324.  On her doctor's advice, she proceeded to the emergency room and was admitted for chest tightness, dizziness and facial tingling. Tr. 1322, 1324.  On February 1, 2011, Watson followed up with neurologist Dr. Jordon.[8]  Tr. 1311-1312.  On February 4, 2011, during a follow up visit with her primary care physician, Watson reported that she was continuing to have problems sleeping, had been admitted again for headaches, and had seen Dr. Jordon.  Tr. 1320.  Watson indicated that her headaches were more likely migraines than TIA.  Tr. 1320.  Her blood pressure was not controlled and she had been having issues with controlling her anger.  Tr. 1320.   On February 18, 2011, Watson reported that she was taking her medication, seeing Stan Fireman,[9] and sleeping better.  Tr. 1318.  She had gained some weight which she attributed to stress eating.  Tr. 1318.

On March 14, 2011, Watson called her doctor and complained of coughing and was wheezing.  Tr. 1317.  Upon her doctor's advice she agreed to go to the emergency room.  Tr. 1317.  On April 5, 2011, Watson reported feeling awful and was concerned that she had "walking pneumonia."  Tr. 1316.  She had been depressed, with congestion and bouts of dizziness and shortness of breath.  Tr. 1316.  She had been unable to sleep and indicated that she had insomnia and anxiety.  Tr. 1316.  She reported smoking between 1-3 cigarettes per day.  Tr.

---

[8] It is unclear what if any recommendations Dr. Jordon made during the February 1, 2011, visit. Tr. 1311.

[9] During the administrative hearing, Watson indicated that she was seeing Stan Fireman, an LISW, for her depression.  Tr. 60.

1316.  The April 5, 2011, progress notes generally reflect "normal" physical exam findings.  Tr.

1316.[10]

### 2.  Medical opinions - physical impairments

#### a.  Treating physician

On March 31, 2009, Dr. Rajesh Agarwal, M.D., an internal medicine physician who

treated Watson, completed a medical form indicating that Watson had the following medical

conditions for greater than three months: hypertension, depression and headaches. Tr. 716.  He

indicated that her health status was improving.  Tr. 716.  He opined that her conditions did not

affect her ability to stand/walk, sit, lift/carry, push/pull, bend, reach, handle, perform repetitive

foot movements, see, hear or speak.  Tr. 717.  He also indicated that it was his belief that she was

employable.  Tr. 717.

#### b.  State agency consultative physician

On June 17, 2009, state agency physician Eulogio Sioson, M.D., saw Watson for a

consultative examination.  Tr.  1132-1133.  He concluded the following:

1.  Hypertension/heart.  She had elevated Bp with no overt congestive heart failure. She described her pain tightness usually on exertion.  She apparently had stress test 1/09 with unknown result.

2.  Neck/back/joint pains. She had no apparent radiculopathy, deformity or inflammatory changes in her joints.

3.  Depression. She was not emotionally labile and was able to maintain attention and concentration.

4.  In summary, based on objective findings, no specific restriction to work-related activities seem evident but if one considers limitation of range of motion from pain, work-related functions such as walking, standing, sitting, carrying and lifting would be impaired.  Handling, hearing and speaking should not be affected.  She should be capable of performing

---

[10] Medical records for the period of August 16, 2011, through December 13, 2011 (Exhibit 24F),are not summarized herein because, as discussed below, those records were not presented to the ALJ and Watson has failed to meet her burden of demonstrating that a sentence six remand is warranted.

sedentary activities.

Tr. 1133.

### c. State agency reviewing physician

On August 4, 2009, state agency reviewing physician Dimitri Teague, M.D., completed a Physical RFC Assessment.  Tr. 1163-1170.  Dr. Teague indicated that Watson alleged shortness of breath due to fluid around her heart, limited walking, severe headaches and frequent hospitalizations.  Tr. 1168.  He found Watson's statements partially credible.  Tr. 1168.   He gave no weight to Dr. Sioson's June 17, 2009, report wherein he opined that Watson would be capable of sedentary work because Dr. Sioson did not support his report with objective evidence. Tr. 1169.

Dr. Teague opined that Watson could perform light work; she could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and except for the restrictions with respect to lifting and/or carrying, unlimited ability to push and/or pull.  Tr. 1164.  He also opined that Watson had the following postural limitations: frequent climbing of ramps and stairs; no climbing of ladders, ropes and scaffolds; and frequent balancing, stooping, kneeling, crouching, and crawling.  Tr. 1165.

On reconsideration of Watson's disability claim, on January 27, 2010, Dr. Anton Freihofner, M.D., affirmed Dr. Teague's August 4, 2009, Physical RFC Assessment.  Tr. 1194. Dr. Freihofner considered Watson's September 16, 2009, emergency room visit due to unspecified chest pain, noted that there were no new allegations or claims of a worsening condition, and no additional sources or treatment.  Tr. 1194.

10

### 3.  Medical opinions - mental impairments

#### a.  State agency consultative physician

On June 15, 2009, state agency consultative physician J. Joseph Konieczny, Ph.D., met with Watson and conducted a psychological evaluation.  Tr. 1126-1130.  She denied any history of problematic use of alcohol.  Tr. 1127.  She reported a history of marijuana use and stated that she had used marijuana about three weeks prior to the evaluation.  Tr. 1127.  He concluded that Watson suffered from a diagnosis of Depressive Disorder, Not Otherwise Specified.  Tr. 1129. He noted that Watson had reported history of marijuana use but indicated that, without further reliable information with respect to her past and recent use of marijuana no further diagnosis would be offered.  Tr. 1129.  He also noted that, without additional information, diagnoses would not be offered with respect to panic attacks and her apparent concern with regard to a number of medical conditions.  Tr. 1129.

Dr. Konieczny proceeded to offer his opinions with respect to Watson's limitations if any in various work-related abilities, including his opinion that Watson had no impairment in her ability to concentrate and to attend to tasks or to understand and follow directions; moderate impairment in her ability to withstand stress and pressure, which he noted was reflective of her depression; mild impairment in her ability to relate to others and to deal with the general public; and mild to moderate deficits in her overall level of judgment, depending upon the nature and severity of her marijuana use.  Tr. 1129.  He indicated that Watson's insight into her current situation was fair.  Tr. 1129.  Her overall level of functioning was at  reduced level of efficiency and she had a GAF score of 52.[11]  Tr. 1129.

---

[11] GAF Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric

### b.  State agency reviewing physician

On July 15, 2009, state agency reviewing physician David Demuth, M.D., completed a Psychiatric Review Technique.  Tr. 1144-1157.  On July 15, 2009, Dr. Demuth also completed a Mental RFC Assessment.  Tr. 1158-1162.

In the Psychiatric Review Technique, Dr. Demuth noted a diagnosis of depressive disorder, NOS, but found that Watson's condition did not meet a Listing, including Listing 12.04.  Tr. 1147.  He concluded that Watson had mild limitations in activities of daily living and in maintaining social functioning and moderate limitations in maintaining concentration, persistence, or pace.  Tr. 1154.  Watson had no episodes of decompensation.  Tr. 1154.

In the Mental RFC Assessment, Dr. Demuth rated Watson's work-related abilities in 20 categories.  Tr. 1158-1159.  Dr. Demuth rated Watson as moderately limited in 2 categories: (1) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (2) the ability to respond appropriately to changes in the work setting.  Tr. 1159.  In 10 categories, Dr. Demuth rated Watson as not significantly limited and with respect to the remaining 8 categories, Dr. Demuth indicated that there was no evidence of limitation.  Tr. 1158-1159.

Dr. Demuth opined that Watson was "capable of work in a static environment where changes can be easily explained.  She can do multistep tasks, [her] stress tol is moderately reduced.  Her social interactions are mildly reduced."  Tr. 1160.

---

Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

On reconsideration of Watson's disability claim, on December 18, 2009, state agency reviewing physician Dr. Marianne Collins, Ph.D., affirmed Dr. Demuth's July 15, 2009, Psychiatric Review Technique and Mental RFC Assessment as written.[12]  Tr. 1193.

**C.     Testimonial evidence**

     **1.     Watson's testimony**

Watson was represented and testified at the administrative hearing.  Tr. 33-70.   She provided information regarding her personal, educational and vocational background.  Tr. 34-42. With respect to why she ultimately applied social security disability benefits, Watson indicated that she had been sick for a while and had been in the hospital a lot and, in 2009, her doctor, Dr. Agarwal, recommended that she apply for disability.  Tr. 38-39, 42-43.

She stated that she has an enlarged heart because of her uncontrolled hypertension.  Tr. 45.  It causes her breathing problems and limits her physical activity.  Tr. 45, 67.  She is tired and lacks the energy to do things that she used to do and that she wants to do.  Tr. 67.  She has had problems with her heart and blood pressure since 2006.  Tr. 45-46.  Her doctors have attempted to treat her condition with various combinations of medication but they have not been able to successfully treat her.  Tr. 45-46.  Watson stated that, when she able to afford her blood pressure medication, she takes it as prescribed.  Tr. 64-65.  However, she indicated that she does not always have the finances to purchase her medication.  Tr. 65.  She checks her blood pressure at home with a  monitor.  Tr. 65.  She was in and out of the hospital because of her blood pressure being really high.  Tr. 64.  She estimated being in and out of the hospital from 2008 through early 2009 approximately 10-12 times due to high blood pressure.  Tr. 64-65.

---

[12] Dr. Collins noted that Watson had not alleged changes in or worsening of her mental conditions and she had no new treatment sources and had not been treated for her mental condition since the consultative examination.  Tr. 1193.

During the couple of months prior to the administrative hearing, Watson had lost about 15-20 pounds.  Tr.  66.  She attributed the weight loss to the fact that her doctors had increased the dosage of her water pills to address the problems with her heart.  Tr. 66-67.

Since about 2005 or 2006, Watson has gotten bad headaches on a daily basis.  Tr. 55.  Her headaches last a couple hours.  Tr. 55.  As treatment for her headaches, she takes prescription Ibuprofen.  Tr. 55-56.   The Ibuprofen works o.k. at times but sometimes she has to go somewhere quiet and dark for her headaches to subside.  Tr. 55.  She gets headaches when her blood pressure is high.  Tr. 66.

She indicated that she has degenerative bone disease in her right hip, congestive heart failure, breathing problems, uncontrolled hypertension and headaches.  Tr. 43-56.  With respect to her hip, Watson indicated that around 2006 her doctor advised her that she needed hip replacement surgery but, because of her heart, she has not had the surgery.  Tr. 44.

Watson had a mini-stroke in 2010 and her doctors have advised her that she still has some blockage in the brain.  Tr. 46.  Her doctors have treated her with aspirin for that condition.  Tr. 46.

Watson stated that, because of her mini-stroke, her neurologist advised her that she should not lift more than about 5-10 pounds.  Tr. 47-48.  She stated that, because of the problems with her hip, she really cannot lift anything.  Tr. 48-49.  She can walk only about 250 feet without sitting down, stopping or being in pain.  Tr. 49.  She can stand for about 15-20 minutes at one time before she starts to feel a tingling sensation in her leg and has to sit down.  Tr. 50.  She can sit for about 40-45 minutes at one time before she begins to feel the tingling through her leg.  Tr. 51.  She indicated that the tingling is a feeling of pain for which she takes Ibuprofen.  Tr. 51-52.  She has told her doctors about the problem and has been prescribed Vicodin and Toradol

14

but has been advised that she needs a hip replacement.  Tr. 52-53.  Watson's most comfortable position is when she is lying on her left side.  Tr. 53.  She is in that position in excess of seven or eight hours during the day.  Tr. 53.  Otherwise, she tries to move around during the course of the day.  Tr. 53-54.  She walks about 2-3 hours during the day and sits about 1-2 hours during the day.  Tr. 54.  Watson indicated that there are probably days when she walks more than 2-3 hours but estimated that the most she would ever walk in a day would be about 4-5 hours.  Tr. 54.

With respect to her alleged mental impairments, Watson stated that she has been suffering from depression and stress.  Tr. 56-57.  She stated that she was diagnosed with PTSD back in 1999 or 2000.  Tr. 57.  She has been treated with medication and has been to counseling.  Tr. 57.  She stated that the counseling is not beneficial because the sessions are too short and only about once each month.  Tr. 57.  She stated that the medication does not help much either; it does not help her sleep.  Tr. 58.  She had a sleep apnea test which revealed that she does suffer from sleep apnea.  Tr. 58.  Her doctors recommended a CPAP machine but she cannot afford it.  Tr. 58-59.  She also stated that the CPAP machine did not work when she used it during the sleep study.  Tr. 59.  She indicated that her depression is not improving because she is sleep deprived.  Tr. 59-60.  She indicated that she has insomnia.  Tr. 61.  She goes to bed between 10:00 p.m. and 11:00 p.m. each night but does not fall asleep until around 4:00 a.m. or 5:00 a.m.  Tr. 61.  Her internal medicine doctor has prescribed her Ambien and melatonin for her sleep apnea but she does not take an antidepressant.  Tr. 60.  She has tried Zoloft and Wellbutrin in the past but they were not working for her.  Tr. 62.  She also indicated that finances were an issue.  Tr. 62.

On an average day, Watson wakes up, bathes, eats, reads and attends choir rehearsal or Bible study at her church.  Tr. 62.  She attends church three times per week.  Tr. 62.  She drives herself to church or is picked up.  Tr. 63.  Because of her breathing problems, there are times that

15

she attends choir rehearsal but does not sing.  Tr.  63, 67.  Watson stated that she does not have sufficient capacity to sing certain songs due to the water build up in her chest and problems with her heart.  Tr. 68.  She tries to sing at least two times each month.  Tr. 63.  She goes grocery shopping but does not shop for other items like clothes because her income does not allow it.  Tr. 63-64.  She spends time outside in her yard.  Tr. 63-64.

Watson has been a smoker.  Tr. 68.  For about 6-8 months prior to and at the time of the administrative hearing, she was smoking about 3 cigarettes each day.  Tr. 68.  Prior to that, she smoked about a half-pack to full-pack each day.  Tr. 68-69.  She indicated that she was trying to stop completely.  Tr. 69.  She occasionally smokes marijuana, about once or twice per year.  Tr. 69, 70.  She indicated that she had last smoked marijuana about six months prior to the administrative hearing and when she does smoke marijuana she gets it from a friend.  Tr. 69-70. She stated that she drinks alcohol maybe two or three times per year.  Tr. 70.  Although one doctor told Watson she was fat and that she needed to lose weight, she stated that a cardiologist told her that her weight issues were not from eating but from water retention.  Tr. 69-70.  She indicated that her doctors have not told her to exercise and because of her hip she is not able to exercise.  Tr. 70.

### 2.    Vocational Expert's testimony

Vocational Expert ("VE") Carol Mosley testified at the hearing.  Tr. 71-78.  The VE described Watson's past work as being primarily in clerical fields.  Tr. 72.  Watson performed work as an accounts receivable clerk which is described as a sedentary job with an SVP of 6 (skilled).[13]  Tr. 72.  Watson performed the accounts receivable clerk job at a light exertional

---

[13] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

level.  Tr. 72.   Watson performed customer service work at a telephone company which is described as a sedentary job with an SVP of 4 (semi-skilled).  Tr. 73.  Watson also performed insurance billing work, which was a sedentary job with an SVP of 5 (skilled).  Tr. 73.  Watson also did some temporary work but it was all clerical or customer service work that ranged from sedentary to light exertional level work.  Tr. 73.

The ALJ proceeded to pose hypothetical questions to the VE.  Tr. 73.  For each hypothetical question, the ALJ asked the VE to assume that the individual is of the same age, education and work experience as Watson.  Tr. 73.  In his first hypothetical, the ALJ asked the VE to assume that the individual could perform light work with no climbing of ladders, ropes or scaffolds; no more than occasional climbing of ramps or stairs; no work at unprotected heights and no work around dangerous machinery; could perform simple and more complex tasks in an environment with routine changes; and could have frequent contact with the general public.  Tr. 73-74.  The VE stated that the hypothetical individual would be able to perform all of Watson's past relevant work and there were other jobs available to such an individual, including: (1) data entry clerk, a sedentary job, SVP of 4, with over 2,500 positions available statewide and over 200,000 nationwide; (2) receptionist, a sedentary job, SVP of 4, with over 2,000 positions available statewide and over 200,000 nationwide; and (3) hotel clerk, a light job, SVP 4,  with over 1,500 positions available statewide and over 150,000 nationwide.  Tr. 74.  If the first described hypothetical individual was off task 5% of the time, the VE indicated that such a limitation would not affect the jobs that she identified.  Tr. 74-75.  Also, if the first described individual was allowed one additional, unscheduled break, of 5-10 minutes each day, the VE indicated that such a limitation would not affect the jobs that she identified.  Tr. 75.

For his second hypothetical, the ALJ asked the VE to assume all of the limitations already described and that the individual could only perform sedentary work with a sit-stand option every hour.  Tr. 75.  The VE indicated that the described individual would not be precluded from performing Watson's past work.  Tr. 75.  With respect to other work, the VE indicated that she would eliminate the hotel clerk position but the data entry and receptionist positions described in connection with the first hypothetical would be available to the individual along with the position of credit card clerk, a sedentary job with an SVP of 3, with over 1,000 positions available statewide and over 150,000 nationwide.  Tr. 75-76.

In response to questions from Watson's counsel, the VE confirmed that, in response to the first hypothetical, which described an individual capable of performing light work, two of the three jobs noted as being available to such an individual were sedentary jobs, with the other job, hotel clerk, being a light job.  Tr. 76.  The VE also indicated that, if the hypothetical individual missed more than 2 days per month, her ability to maintain competitive employment would be impacted.  Tr. 76-77.  The VE further indicated that being off-task 10% of the day would not affect work but being off-task beyond 10% of the day would impact an individual's ability to maintain competitive employment over time.  Tr. 77.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable

18

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[14] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[15] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[16] see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[14] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[15] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[16] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his July 8, 2011, decision, the ALJ made the following findings:[17]

1.    Watson met the insured status requirements through December 31, 2013. Tr. 14.

2.    Watson had not engaged in substantial gainful activity since March 5, 2009, the alleged onset date.  Tr. 14.

3.    Watson had the following severe impairments: cardiac issues and depression.  Tr. 14-15.  The following impairments were non-severe: degenerative joint disease of the right hip, obesity, and mild obstructive sleep apnea.  Tr. 14-15.

4.    Watson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including Listing 4.02, *Chronic Heart Failure*, and Listing 12.04, *Affective Disorders*.  Tr. 15-17.

5.    Watson had the RFC to perform light work but her ability to perform the full range of light work is eroded by additional limitations.  She cannot climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs.  She cannot work around hazards, meaning she cannot work at unprotected heights or around dangerous machinery.  She can perform simple and more complex tasks in an environment with routine changes. She can tolerate frequent contact with the general public.  Additionally, she will be off task five percent (5%) of the time, and requires one additional unscheduled break of five to ten minutes per day.  Tr. 17-20.

6.    Watson was capable of performing her past relevant work as an accounts receivable clerk, customer service representative, and insurance billing clerk. 20-21.

7.    Watson was born in 1964 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 21.

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[17] The ALJ's findings are summarized.

8.    Watson had at least a high school education and was able to communicate in English.  Tr. 21.

9.    Transferability of job skills was not material to the determination of disability.  Tr. 21.

10.   Alternatively, considering Watson's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Watson could perform, including data entry clerk, receptionist, and hotel clerk.  Tr. 21-22.

Based on the foregoing, the ALJ determined that Watson had not been under a disability from March 5, 2009, through the date of the decision.  Tr. 22.

## V. Parties' Arguments

### A.    Plaintiff's arguments

First, Watson asserts that the ALJ erred in evaluating her credibility.  Doc. 15, pp. 12-17. She argues that the ALJ failed to follow SSR 96-7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, and SSR 82-59, *Failure to Follow Prescribed Treatment*.  Doc. 15, pp. 12-17.

Second, Watson seeks a sentence six remand for consideration of South Pointe Hospital records for the period of August 16, 2011, through December 13, 2011, which are records that post-date both the administrative hearing (May 19, 2011, Tr. 29) and the ALJ's decision (July 8, 2011, Tr. 9).[18]  Doc. 15, pp. 17-20.  Watson argues that the records are "new" and "good cause" exists for not providing them earlier because they did not exist at the time of the administrative hearing or decision.  Doc. 15, p. 19.  She also argues that the records are "material" because they relate to her condition at the time of the hearing (Doc. 15, p. 19) and that there is a reasonable

---

[18] The Court notes that, within Exhibit 24F, there is a pre-hearing record dated March 14, 2011, a x-ray report.  Tr. 1474.  However, Watson has not asserted that the March 14, 2011, x-ray report was presented to the ALJ or should be considered differently than the other post-hearing records contained in Exhibit 24F.  Moreover the March 14, 2011, x-ray report showed, "The lungs are clear.  The cardiomediastinal silhouette is within limits of normal. Osseous structures unremarkable."  Tr. 1474.  Thus, it is unclear how this record would be considered "material."

probability that the disability determination would have been different had the "new" records

been available during the administrative proceedings (Doc. 15, p. 20).  She asserts that the "new"

records show that, even when compliant with her blood pressure medication, her blood pressure

remained uncontrolled.  Doc. 15, p. 19.  She asserts that the "new" records further document her

inability to afford her medication and that she quit smoking completely shortly after the decision

was issued.  Doc. 15, pp. 19-20.

**B.      Defendant's arguments**

The Commissioner argues that the ALJ complied with SSR 96-7p when assessing

Watson's credibility and the ALJ's credibility determination is supported by substantial

evidence.  Doc. 16, pp. 10-16.  The Commissioner argues that the ALJ properly considered the

entire record, including objective medical evidence, reports of daily activities, non-compliance

with medical treatment and explanations offered for her non-compliance. Doc. 16, pp. 10-15.

The Commissioner also argues that Watson's claim that the ALJ improperly failed to follow SSR

82-59 is without merit because that Social Security Ruling "applies 'only after an ALJ finds the

claimant would otherwise be disabled.'" Doc. 16, p. 15 (citations omitted).

Second, the Commissioner argues that Watson is not entitled to a sentence six remand

because she cannot demonstrate that the "new" records are "material" and she cannot

demonstrate "good cause" for her failure to incorporate the "new" evidence into the record prior

to the hearing.  Doc. 16, pp. 16-21.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A.     The ALJ conducted a proper credibility assessment

### 1.   SSR 82-59

SSR 82-59 provides that a claimant "who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability." Social Security Ruling SSR No. 82-59, 1982 WL 31384, *1 (1982).  SSR 82-59 applies only after an ALJ has concluded that a claimant is disabled.  *See Hester v. Sec of Health & Human Serv.*, 886 F.2d 1315, * 3 (6th Cir. 1989) (remanding case for further proceedings but indicating that "[f]ailure to follow prescribed treatment becomes a determinative issue only if the

23

claimant's impairment is found to be disabling under steps one through five and is amenable to treatment expected to restore ability to work") (internal citations omitted)**;** *Kinter v. Colvin*, 2013 WL 1878883, * 9 (N.D. Ohio Apr. 18, 20*13) report and recommendation adopted,* 2013 WL 1869661 (N.D. Ohio May 3, 2013) (finding SSR 82-59 not applicable where the ALJ had not made a prior determination of disability and used claimant's non-compliance with treatment recommendations only as one factor in assessing the claimant's credibility).  Here, the ALJ did not conclude that Watson was disabled but, with treatment, would be able to work.  Accordingly, the Court finds that SSR 82-59 is not applicable and Watson's claim that the ALJ erred by not adhering to SSR 82-59 is without merit.

### 2.  SSR 96-7p

SSR 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms.  First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20

C.F.R. § 404.1529(c); SSR 96–7p, 1996 WL 374186, at 3 (July 2, 1996).  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 F. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Under SSR 96-7p, the ALJ's consideration of Watson's non-compliance with medical treatment was proper.  SSR 96-7p provides, in part, that:

> the individual's statements may be less credible if the level of frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.  However, the adjudicator must not draw inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

SSR No. 96–7p, 1996 WL 374186, at 7 (July 2, 1996).

Here, when considering Watson's non-compliance with treatment, in accordance with SSR 96-7p, the ALJ considered her claim that she could not always afford her medication.  Tr. 18.  However, he found that her statements were undermined by the fact that she continued to be able to finance her smoking habit.[19]  Tr. 19.  Consideration of the costs associated with cigarette smoking in conjunction with Watson's claim that she was unable to afford medication was not per se improper.  *See e.g.*, *Robinette v. Astrue*, 2012 WL 5988792, * 5 (E.D. Ky. Nov. 29, 2012)

---

[19] The ALJ also concluded that Watson minimized her use of alcohol and drugs and was able to afford alcohol and drugs.  Tr. 19.  Watson argues that there is no support in the record for this finding.  However, because the ALJ's credibility determination is supported by other substantial evidence, to the extent his specific findings with respect to Watsons's use and purchase of alcohol and drugs are not adequately supported, any such error is harmless.  *See* *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (recognizing that, although applied cautiously, a finding of harmless error may be appropriate in social security cases).

(rejecting a claimant's argument that the ALJ improperly considered her ability to purchase cigarettes despite her claims that she could not afford medication).  Additionally, to the extent that Watson asserts that the ALJ's decision is faulty because a few cigarettes each day "is hardly a financial burden, even if she was purchasing them herself as opposed to 'bumming' them" (Doc. 15, p. 16), the record reveals that, while Watson was only smoking 3 cigarettes at the time of the hearing and for about 6-8 months before the hearing, prior to that, she smoked anywhere from a half a pack to a pack each day. Tr. 68-69.   Further, even, if as Watson suggests, the costs associated with her smoking habit were minimal (Doc. 15, p. 16), as part of his credibility analysis, the ALJ also considered the fact that Watson's smoking habit was inconsistent with treatment recommendations.[20]  Tr. 18-19.

Even if the ALJ erred in his consideration of Watson's non-compliance, a review of the decision makes clear that, in reaching his determination, the ALJ did not solely rely upon Watson's non-compliance.  As discussed below, consistent with SSR 96-7p, the ALJ properly considered the entire record and found that Watson's allegations were not fully credible.

The ALJ considered and discussed Watson's daily activities and social activities, which included attending church three times each week to attend Bible Study, choir rehearsal, and church services.  Tr. 16, 62-63.   He considered that she did not take medication for depression because she did not believe that it helped (Tr. 16, 62) and that she treated her pain conservatively

---

[20] Because Watson testified at the hearing that she had recently lost weight, she also takes issue with the fact that the ALJ concluded her credibility was undermined by her failure to exercise and lose weight as instructed by her doctors.  Doc. 15, pp. 16-17.  While Watson did testify at the hearing that she had recently lost about 15-20 pounds over the couple of months prior to the hearing, that weight loss was very recent and was the result of her doctor having increased the amount of water pills that she took.  Tr. 66-67.   Since her recent weight loss did not necessarily reflect a consistent attempt to comply with regard to her doctor's recommendations with weight loss and/or exercise, the ALJ's findings with respect to Watson's non-compliance with her doctor's weight loss/exercise are supported by the record.

with Ibuprofen[21] (Tr. 16, 55).  He considered that she performed well while attending college courses and would like to go back. Tr. 16, 37.

He considered the medical opinions, including the opinions from Watson's treating physician, state agency reviewing physicians, and state agency consultative physicians.  Tr. 19-20.  Watson's own treating physician, Dr. Agarwal, on March 31, 2009, within a month of her alleged onset date, completed a report regarding the effect of Watson's impairments on her functional abilities.  Tr. 716-717.   As noted by the ALJ, Dr. Agarwal opined that Watson's impairments had <u>no</u> effect on her ability to sit, stand, walk, lift, carry, push, pull, bend, reach handle, or carry out other functions.  Tr. 19, 716-717.  The ALJ found Dr. Agarwal's opinion to be consistent with the other credible evidence of record, including a vast majority of the diagnostic studies.  Tr. 19.   The ALJ also found that state agency reviewing physician Dr. Teague's opinion that Watson could perform light work with some restrictions was consistent with the evidentiary record as whole including the relatively benign diagnostic findings.  Tr. 19; 1164-1170.

The foregoing demonstrates that, as required by SSR 96-7p, the ALJ "consider[ed] the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p, 1996 WL 374186, *1.  Moreover, the ALJ's credibility analysis and disability determination were not based solely on Watson's non-compliance and his decision is supported by substantial evidence.  Thus, considering the great weight and deference to be afforded the ALJ's credibility determination and the fact that the ALJ based his decision on

---

[21] Watson obtained her Ibuprofen through a prescription.  Tr. 56.  She was initially on 600 milligrams but the dosage was increased to 800 milligrams.  Tr. 56.

a review of the entire record, to the extent that the ALJ erred in his consideration of Watson's non-compliance, reversal and remand is not warranted. *See Cook v. Astrue*, 2013 WL 139940, *2-3 (N.D. Ohio Jan. 10, 2013) (affirming an ALJ's credibility determination which took into account a claimant's missed medical appointments where such absences were not the only evidence considered).

**B.      Watson's request for a sentence six remand is not warranted**

Watson has requested that this Court remand her case to the Commissioner for consideration of evidence not presented to or considered by the ALJ. Doc. 15, pp. 17-20. More specifically, she requests remand for consideration of South Pointe Hospital records dated August 16, 2011, through December 13, 2011.[22] Doc. 15, pp. 18-19 (referencing Tr. 1353-1474).

The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the evidence presented to the ALJ. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *see also Osburn v. Apfel*, No. 98–1784, 1999 WL 503528, at * 4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ."). The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and a sentence six remand where the court makes no

---

[22] Watson submitted these "new records" to the Appeals Council but the Appeals Council did not remand the matter. Doc. 15, pp. 18-19; Tr. 1-2.

substantive ruling as to the correctness of the Commissioner's decision.  *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006).  The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it only can consider such evidence in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

The plaintiff has the burden under sentence six of 42 U.S.C. § 405(g) to demonstrate that the evidence he now presents in support of a remand is "new" and "material," and that there was "good cause" for his failure to present this evidence in the prior proceeding.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit materials and that the evidence was "material.").  Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied).  "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.*  (internal quotations and citations omitted and emphasis supplied) "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id.*  (internal quotations and citations omitted and emphasis supplied).

The evidence that Watson seeks to have considered on remand are records dated after the May 19, 2011, administrative hearing.  Thus, because they were not in existence at the time of the administrative hearing,[23] Watson may be able to demonstrate that the August 16, 2011, through December 13, 2011, records are "new" and/or that she had "good cause" for not

---

[23] *See* FN 18 for discussion of a pre-hearing record contained in Exhibit 24F.

producing the records at or prior to the administrative hearing.[24]  However, even if Watson can

satisfy the "new" and "good cause" elements, she has failed to carry her burden of demonstrating

that the August 16, 2011, through December 13, 2011, records are "material."

Watson argues that the records are "'material' to the determination of disability because

they relate to her condition at the time of the hearing.'"  Doc. 15, p. 19.  To support this

argument she asserts that: (1) "[t]he new evidence shows that, as of August 2011, less than a

month after the ALJ's decision, Plaintiff *was again compliant* with her blood pressure

medications, but even with compliance, her blood pressure remained uncontrolled (Tr. 1435)[;]"

(2) "the new records also further document Plaintiff's difficulty affording her medications (Tr.

1432, 1443) [;]" and (3) "the records document that Ms. Watson quit smoking entirely shortly

after the decision was rendered."  Doc. 15, p. 19.  Notwithstanding Watson's attempt to argue

otherwise, the allegedly "new" evidence fails to provide further evidence about Watson's

impairments during the period of March 5, 2009, through July 8, 2011.   Thus, even if the

records demonstrate that Watson's condition worsened after the final decision of the

Commissioner or that she quit smoking, those records do not relate to the period of time covered

by the ALJ's decision.  *See Oliver v. Sec'y of Health and Human Serv.*, 804 F.2d 964, 966 (6th

Cir. 19*86) (evidence that was compiled after a final decision and that did not provide information

with respect to the claimant's condition at the time of the decision was not "material" and

therefore a sentence six remand was not warranted); *see also Sizemore v. Sec'y of Health and

Human Serv.*, 865 F.2d 709, 711 (6th Cir. 19*88) (noting that, where a claimant seeks to submit

---

[24] As it pertains to the "good cause" element, even where the alleged "new" evidence was prepared following a final
decision such that it could not have been presented at the hearing, a claimant must still demonstrate a valid reason
for failing to obtain the evidence prior to the hearing.  *Oliver*, 804 F.2d at 966 (discussing *Willis v. Sec'y of Health
and Human Serv.*, 727 F.2d 551, 554 (6th Cir. 19*84).

additional evidence which shows a worsening condition that occurred after a decision is rendered, an appropriate course of action would be to initiate a new claim).

Watson also attempts to argue that the result of her disability determination would have been different had the records been available during the administrative hearing because the "new" records address the issue of alleged noncompliance. Although not entirely clear, Watson appears to argue that, if the new records are considered, there will be evidence to support her claim that she could not afford medication and, therefore the ALJ will have to find her credible and disabled.  Doc. 15, pp. 19-20.  The "new" evidence that Watson points to in support of her claim that she had problems affording her medication are physician records reflecting that Watson reported that she had been unable to get her blood pressure medication. Tr. 1432 (stating she was unable to get her medication); 1443 (stating that because of financial burdens she runs out of medication towards the end of the month).  The ALJ considered similar evidence.  For example, he considered the fact that Watson had reported her financial barriers to physicians.  Tr. 18.  However, after considering that evidence *along with the entire record*, the ALJ found Watson's allegations with respect to the intensity, persistence and limiting effects of her symptoms not entirely credible.  Tr. 18.   Watson's "new" evidence with respect to her inability to afford medication is duplicative of evidence already considered by the ALJ in assessing her credibility.

With respect to her claim that "new" evidence is material because it shows that, even when compliant with her medication, her blood pressure remained uncontrolled, Watson points to an August 26, 2011, treatment record.  Doc. 15, p. 19 (relying on Tr. 1435).  However, that treatment record contains notes that are contrary to Watson's claim.  For example, the August 26,

2011, treatment record states, in part, "Essential hypertension, benign – much improving control" and "HA (headache) – improving since starting verapamil and sleeping better."  Tr. 1435-1436.

Based on the foregoing, Watson is unable to demonstrate that there is "a reasonable probability that the Secretary would have reached a difference disposition of the disability claim if presented with the new evidence."  *Sizemore*, 865 F.2d at 711.  Accordingly, Watson is not entitled to a sentence six remand for the purpose of considering additional evidence not submitted to the ALJ and the Court will not consider any evidence that was not in the record when the ALJ issued his decision.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFRIMS** the Commissioner's decision.

Dated:  March 14, 2014

Kathleen B. Burke
United States Magistrate Judge

32